Filed 6/17/14  P. v. Featherson CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DARNELL FEATHERSON,<br><br>        Defendant and Appellant. | A135299<br><br>(Contra Costa County<br>Super. Ct. No. 051118256) |

Darnell Featherson was convicted by a jury of shooting at an inhabited dwelling. He contends the trial court erred when it found witness Shontise Luckett was legally unavailable to testify and admitted her preliminary hearing testimony at trial.  He further asserts the admission of various witnesses' prior inconsistent statements violated his due process right to a fair trial and that his trial counsel was ineffective for failing to consult with or retain an expert on eyewitness identification.  None of his contentions have merit, so we affirm the judgment.

## BACKGROUND

Luckett identified defendant as the assailant who fired shots through her bedroom window in a 911 call, to police officers who responded to the 911 dispatch, and to a detective several days after the incident.  She disavowed her identification at the preliminary hearing and subsequently invoked the Fifth Amendment and refused to testify at trial.  During trial, her account of the shooting emerged primarily from her 911 call and her preliminary hearing testimony, which were introduced as substantive

1

evidence, and her disavowed prior statements to police, which were introduced for impeachment.

Defendant and Luckett were previously in a romantic relationship and have twin children together. However, their relationship ended and in the spring of 2011 Luckett became involved with Damon Black. Defendant was jealous of Black and the breakup was difficult for him. For several weeks before the shooting he called and texted Luckett every day, threatening her, calling her "bitch this, bitch that," and warning "I'm going to get you and your nigga." A day or two before the shooting, Black called defendant, told him that he and Luckett were now a couple, and asked him to stop bothering her.

On August 13, 2012, Luckett, Black, and Luckett's two-year-old son Darnell were asleep in Luckett's master bedroom. At approximately 3:20 a.m. Luckett awoke to the sound of gunshots. When she looked out the bedroom window she saw defendant firing a weapon into the window from the backyard. He had removed the screen and opened the window. He cursed at Luckett and Black, saying something like "Bitch. Bitch nigga" or "Where that bitch ass nigga at?"

Black fled. Luckett grabbed Darnell and called 911. In the 911 call, she identified defendant as the shooter. When the 911 operator asked Luckett how she knew defendant was the assailant, Luckett responded "I'm—he shot through my window. I looked right at him, screaming and hollering. I looked at him." Cell phone data placed defendant approximately five and one half miles from Luckett's house 18 minutes before she called 911. Several hours after the shooting, Luckett sent defendant a text message that said "you grazed me with a bullet."[1] Defendant texted back, "you is the biggest liar."

Officer Adrian Gonzalez responded to the 911 call. Luckett told Officer Gonzalez that she woke up to a loud crash and the sound of gunshots. When she looked to the source of the sound, she saw defendant at the window shooting a black semiautomatic handgun in her direction and into the ceiling, saying "Bitch, I told you." The officers found a bullet hole in the ceiling above Luckett's bed, an expended nine millimeter shell

---

[1]Luckett was not actually hit by a bullet. These text messages were admitted only for impeachment.

casing in a laundry basket beneath the master bedroom window, and four additional shell casings in the backyard outside the window. The bedroom window was wide open and the screen lay on the ground outside.

Officer Marty Hynes arrived within minutes of the 911 dispatch call and encountered Black, clad only in undershorts, in front of Luckett's house. Black told him he was asleep in bed next to Shontise and Darnell when he was awakened by the sound of the window screen being removed. He saw defendant standing outside of the window pointing a gun into the house, then heard and saw the gun discharge five or six rounds. At trial, Black recanted his previous identification of defendant and testified that he was in the garage, not the bedroom, when he heard the shots. He said he did not see defendant that night and, in fact, had never seen him. Luckett asked him what was going on and whether he'd heard fireworks; she did not tell Black she recognized defendant's voice or that he shot into the window. Black denied having recently asked defendant to leave him and Luckett alone.

Officer Hynes also spoke with Luckett's oldest daughter, Wilnesha Featherstone. Featherstone said she awoke to the sound of someone trying to open the patio door. She heard gunshots and saw defendant shooting a gun into the house. She did not see his face, but recognized his voice. At trial, Featherstone testified that she "never said anything about" defendant to police, remembered nothing about her conversations with police, did not remember seeing defendant the night of the shooting, and could not have seen him because she was not wearing her glasses.

On August 16, Luckett's 11-year-old daughter Aiyana Henderson told Detective Michael Mellone that on the night of the shooting she heard someone trying to get in the back door, followed by the sound of blinds and then gunshots. Henderson said she knew defendant was the culprit because he had done the same thing before. At trial, Henderson testified that she heard her mother tell police defendant was the shooter, but that Luckett later said she had been mistaken and defendant was not the culprit.

Detective Mellone interviewed Luckett and Black on August 17. Luckett described the events of August 13 in detail and again identified defendant as the

3

perpetrator. Black said that he could not see the shooter's face, but that Luckett told him it was defendant.

At the preliminary hearing, Luckett recanted her identification. In addition, she and Black both wrote letters in which they said defendant was not the assailant. Luckett wrote that she didn't see him at the house, merely assumed the voice she heard was his, and "was only trying to teach [defendant] a lesson" when she told police he was the shooter. She also wrote that Black lied about the shooting because he was jealous of defendant and afraid Luckett would resume her relationship with him. Black wrote that Detective Mellone "bamboozled" and coached him into identifying defendant as the culprit. Excerpts of both letters were read to the jury for impeachment.

## DISCUSSION

### I. The Admission of Luckett's Preliminary Hearing Testimony

#### A. Background

Luckett recanted her initial identification of defendant at the preliminary hearing and, at a hearing in limine at the outset of the trial, invoked her Fifth Amendment privilege against self-incrimination and refused to answer questions. The court conducted an in camera hearing with Luckett and her attorney outside the presence of the prosecutor and defense counsel. After the in camera hearing, the court found an adequate basis for Luckett's invocation of her Fifth Amendment privilege and ruled over defense objections that her preliminary hearing testimony was admissible. The court also admitted a recording of Luckett's 911 call, as well as her incriminating statements to police the night of the shooting. Luckett's preliminary hearing testimony and 911 call were admitted for their truth, while her statements to police were admitted only for impeachment.

#### B. The In Camera Transcripts Must Remain Sealed

Prior to filing his opening brief on appeal, defendant asked this court to unseal the transcript of the in camera hearing. We denied his request without prejudice to his right to raise the issue in his appellate briefing. Our order explained that "[a]s a general matter, an appellant is not entitled to gain access to information on appeal that it was

4

denied at the trial court level. The right to appellate review is limited to a determination as to whether the lower court's ruling was correct. This court may generally make its determination by reviewing the transcript of the in camera proceedings. (*People v. Price* (1991) 1 Cal.4th 324, 493; *People v. Collins* (1986) 42 Cal.3d 378, 395, fn. 22; *Herrera v. Superior Court* (1985) 172 Cal.App.3d 1159, 1163; cf. Evid. Code, §§ 915, subd. (b), 1042, subds. (b), (d); Cal. Rules of Court, rule 8.328(b)(6).)"

Defendant renewed his request in his opening brief, but provides no reason for us to alter our ruling. He attempts to distinguish the above cited authorities and others that support the denial of access to Luckett's in camera statements on the ground that the authorities address statutorily-protected information, e.g., the identity of confidential informants, police records, trade secrets, and attorney work product, not a witness's invocation of the Fifth Amendment privilege. The essence of his position is that the fundamental constitutional privilege against self-incrimination embodied in the Fifth Amendment (see *Withrow v. Williams* (1993) 507 U.S. 680, 692; Evid. Code, §940) is entitled to lesser protection than privileges created by statute. Plainly, that cannot be so. We are not insensitive to the frustration of appellate defense counsel who cannot personally review testimony sealed to protect a witness's Fifth Amendment privilege, but the prohibition is compelled by Luckett's invocation of her constitutional right not to incriminate herself. Where disclosure to appellate counsel could reveal such privileged information, the Supreme Court counsels that parties " 'must do the best they can with the information they have, and the appellate court will fill the gap by objectively reviewing the whole record.' " (*People v. Price*, *supra*, 1 Cal.4th at p. 493, quoting *People v. Collins*, *supra*, 42 Cal.3d at p. 395, fn. 22.) We have conducted that review, which must suffice.

C. The Trial Court Properly Permitted Luckett To Invoke the Fifth Amendment

Defendant contends the court erred when it found Luckett entitled to assert the Fifth Amendment. He argues Luckett failed to establish that the testimony the prosecutor sought to elicit was incriminating, and that the trial court failed to ascertain whether

5

something less than a blanket assertion of the privilege would suffice to protect her. Neither argument has merit.

The relevant facts are not disputed, so we review the trial court's ruling independently. (*People v. Seijas* (2005) 36 Cal.4th 291, 304.) The Fifth Amendment privilege is properly invoked if "the witness has reasonable cause to apprehend danger from a direct answer." (*Hoffman v. United States* (1951) 341 U.S. 479, 486.) The initial burden is on the witness claiming the privilege to show that the requested answer might tend to incriminate her. (*People v. Ford* (1988) 45 Cal.3d 431, 440.) It is then the court's responsibility to determine whether an answer might tend to incriminate. (*Id.* at p. 441.) " 'The witness is not exonerated from answering merely because he declares that in doing so he would incriminate himself—his say-so does not of itself establish the hazard of incrimination.' " (*People v. Seijas, supra*, 36 Cal.4th at p. 304, quoting *Hoffman v. United States, supra,* at p. 486.) Rather, "the privilege is properly invoked whenever the witness's answers 'would furnish a link in the chain of evidence needed to prosecute' the witness for a criminal offense." (*People v. Cudjo* (1993) 6 Cal.4th 585, 617, quoting *Hoffman v. United States, supra*, 341 U.S. at p. 486.) In determining whether this standard has been met, the court may consider the implications of the question and the setting in which it is asked, since even an explanation of the reasons for fearing prosecution could result in injurious disclosure. (*People v. Cudjo, supra,* at p. 617.) Thus, "when a witness grounds a refusal to testify on the privilege against self-incrimination, a trial court may compel the witness to answer only if it 'clearly appears to the court' that the proposed testimony 'cannot possibly have a tendency to incriminate the person claiming the privilege.' " (*Id.* at p. 617; *People v. Seijas, supra*, 36 Cal.4th at pp. 304–305.)

The court should make a particularized inquiry as to whether a claim of privilege is properly invoked, tailored to the circumstances of the case. (*People v. Lucas* (1995) 12 Cal.4th 415, 454; *Blackburn v. Superior Court* (1993) 21 Cal.App.4th 414, 429.) Factors it may consider include: " '1) the nature of the information sought to be disclosed, 2) implications derived from the questions asked, 3) the nature and verifiability of any

6

investigation or proceeding claimed to justify the fear of incrimination, or the possibility that any such investigation or proceeding may be commenced, 4) matters disclosed by counsel in argument on the claim of privilege, and 5) evidence previously admitted.' " (*Blackburn v. Superior Court, supra,* at p. 429)  The privilege "must be accorded liberal construction in favor of the right it was intended to secure."  (*Hoffman v. United States, supra*, 341 U.S. at p. 486.)

Here, defendant asserts that "it is unclear exactly what Ms. Luckett believed would expose her to danger should she testify at trial" and there is "no indication . . . the trial court even considered narrowing" her assertion of privilege.  (See *Warford v. Medeiros* (1984) 160 Cal.App.3d 1035, 1045–1046 [ "blanket" assertion is generally insufficient; court should conduct inquiry into whether the privilege is justified as to specific areas of questioning].)  We disagree.  The unsealed transcript, without reference to the sealed proceeding, indicates Luckett had reason to believe she could be incriminated by testifying at trial.  At the outset of her testimony at the preliminary hearing, Luckett asked the court, "Do I have the right to request an attorney?  I have been threatened so much from the district attorney and the police that I don't want to say the wrong thing and land in jail and my children removed from my home."  Under questioning by both sides just before trial, she asserted her Fifth Amendment privilege when asked whether she struck an investigator who tried to serve her with a subpoena the previous week; whether she lied at the preliminary hearing; whether she had received text messages from defendant about resuming their romantic relationship; and whether in June 2011 she reported to police that he had fired a gun at her house.  The court then conducted the in camera hearing.  Our review of the sealed transcript of that hearing leaves no doubt that the court adequately probed Luckett's reasons for refusing to testify and, based on her responses, correctly determined her testimony could be incriminating and permitted her to invoke the Fifth Amendment.  (See, e.g., *People v. Farmer* (1983) 145 Cal.App.3d 948, 951 [witness unavailable where record showed she would refuse to testify as to any matter to which she had testified at preliminary examination]; *People v. Hollinquest* (2010) 190

7

Cal.App.4th 1534, 1547–1548.)  Defendant's suggestion of error is refuted by the record surrounding Luckett's refusal to testify and the court's inquiry.

### D.  The Court Properly Admitted Luckett's Preliminary Hearing Testimony

Defendant alternatively asserts the court erred when it admitted Luckett's preliminary hearing testimony because his motive and opportunity to cross-examine her in the preliminary hearing was insufficiently similar to his aims at trial.  Specifically, he contends that his purpose at the preliminary hearing was to elicit information about a possible third-party shooter and "an exonerating recantation" from Luckett, while his goal at trial was to "completely discredit[]" her before the jury.  The contention is unpersuasive.

Prior testimony of an unavailable witness is not made inadmissible by the hearsay rule if, at the time the unavailable witness gave testimony, "the cross-examination was made 'with an interest and motive similar' to that of the prior proceeding."  (*People v. Harris* (2005) 37 Cal.4th 310, 332; Evid. Code, § 1291, subd. (a)(2).)  The " ' motives need not be identical, only "similar." ' [Citation.]  'Both the United States Supreme Court and this court have concluded that "when a defendant has had an opportunity to cross-examine a witness at the time of his or her prior testimony, that testimony is deemed sufficiently reliable to satisfy the confrontation requirement [citation], regardless whether subsequent circumstances bring into question the accuracy or the completeness of the earlier testimony." ' " (*People v. Harris, supra,* at p. 333.)  The admission of former testimony under such circumstances complies with constitutional requirements " 'not because the opportunity to cross-examine the witness at the preliminary hearing is considered an exact substitute for the right of confrontation at trial [citation], but because the interests of justice are deemed served by a balancing of the defendant's right to effective cross-examination against the public's interest in effective prosecution.' " (*People v. Samayoa* (1997) 15 Cal.4th 795, 850.)

Defendant's motive and interest in questioning Luckett at the preliminary hearing were fundamentally the same as at trial:  to undermine her initial identification of defendant as the perpetrator, and to explain and bolster her subsequent renunciation of

8

that identification. Defendant's claim that he had no reason to cross-examine Luckett at the preliminary hearing because she had withdrawn her accusation is wrong. Once Luckett renounced her earlier identifications, defense counsel knew at the preliminary hearing that the prosecution would likely rely on her inculpatory statements. Accordingly, the defense had the same motive in the preliminary hearing as at trial, to undermine the validity of those early statements.

Defendant maintains he "had no prior opportunity to question Ms. Luckett about the statements allegedly given the night of the shooting, to confront the testimonial statement taken by Detective Mellone, or delve into her recantation of the accusations she made." Here too, we disagree. Defense counsel was perfectly free to question Luckett about those topics at the preliminary hearing. "[A] prior opportunity to cross-examine a witness who has become unavailable is considered an adequate substitute for present cross-examination at trial." (*People v. Jones* (1998) 66 Cal.App.4th 760, 766.) Thus, " ' "[A]s long as a defendant was provided the opportunity for cross-examination, the admission of preliminary hearing testimony under Evidence Code section 1291 does not offend the confrontation clause of the federal Constitution simply because the defendant did not conduct a particular form of cross-examination that in hindsight might have been more effective." [Citations.]' " (*People v. Hollinquest, supra,* 190 Cal.App.4th at pp. 1548–1549, italics omitted.)

In a related argument, defendant also contends the admission of Luckett's statements to Detective Mellone on August 17 violated his Sixth Amendment right to confrontation. But those statements were admitted only for purposes of impeachment, not for their truth. "[T]he confrontation clause does not prohibit the prosecution from impeaching the former testimony of its own unavailable witnesses with their inconsistent statements, provided those statements are admitted only for impeachment purposes." (*People v. Blacksher* (2011) 52 Cal.4th 769, 808.) Accordingly, Luckett's out of court statements to Mellone were properly admitted.

9

## II. The Admission of Prior Inconsistent Statements Did Not Violate Defendant's Due Process Rights

Defendant contends that the admission, as prior inconsistent statements, of Luckett's, Black's, and Featherstone's statements to police officers the night of the shooting and Luckett's and Black's statements to Detective Mellone several days later deprived him of a fair trial. This is so, as we understand the argument, because the prosecutor was aware these witnesses had repudiated their initial identification of defendant, but nonetheless called them to testify (or, as to Luckett, introduced her preliminary hearing testimony) solely to present their prior, unsworn identifications as impeachment evidence. Defendant seems to acknowledge the admission of these statements did not violate his Sixth Amendment right of confrontation and, apparently, that the evidence thus admitted was sufficient to support his conviction. But he contends that "[f]undamental elements of fairness were lacking" because his "conviction rested completely on unsworn and repudiated testimony" presented by the prosecution as a subterfuge to get otherwise inadmissible evidence in front of the jury " 'in the name of impeachment.' "

There was no due process violation. Preliminarily, defendant did not object to admission of these statements on due process grounds at trial, so he forfeited the issue for appeal. (See *In re Sheena K.* (2007) 40 Cal.4th 875, 880; *People v. Vera* (1997) 15 Cal.4th 269, 275–276.) "Ordinarily, a criminal defendant who does not challenge an assertedly erroneous ruling of the trial court in that court has forfeited his or her right to raise the claim on appeal." (*In re Sheena K., supra,* 40 Cal.4th at p. 880.) Nonetheless, in view of defendant's claim that his counsel was ineffective for failing to raise a due process objection, we will address the substance of his contention.

First, the "unsworn and repudiated testimony" was far from the sole evidence of guilt. For example, Featherstone admitted at trial that she heard Luckett say "Darnell" shortly after the shots were fired. Defendant was linked to the crime by the cell phone data that placed him near the crime scene at 3:00 a.m., shortly before the shooting. The prosecution introduced a series of incriminating phone and text message records that

10

tended to prove both the jealousy that incited the shooting and subsequent efforts by Luckett, defendant and, to some extent, Black, to keep defendant from "going down for this."  His contention that his conviction rests completely on the repudiated prior statements is thus more hyperbole than it is an accurate description of the record.

Defendant's argument also fails to acknowledge that, while Luckett's inconsistent statements to police were admitted only for impeachment because she did not testify at trial (see Evid. Code, § 1235; *California v. Green* (1970) 399 U.S. 149), her 911 call and Black's and Featherstone's nontestimonial statements to responding officers minutes after the shooting were admitted for the truth as spontaneous declarations.  (Evid. Code, § 1240)  The court admitted these statements only after it determined at a contested Evidence Code section 402 hearing that they fell within the traditional hearsay exception and were nontestimonial for purposes of the Confrontation Clause (see *Michigan v. Bryant* (2011) ___ U.S. ___, 131 S.Ct. 1143, 1154, 1157).  That finding substantially undermines defendant's argument that the evidence on which he was convicted was so unreliable as to affront his due process right to a fair trial.  (See *In re Daniel W.* (2003) 106 Cal.App.4th 159, 167 [" 'Our precedents have recognized that statements admitted under a "firmly rooted" hearsay exception are so trustworthy that adversarial testing would add little to their reliability' "].)

Moreover, the witnesses' prior identifications of defendant as the shooter were not introduced in a vacuum.  Black and Featherstone testified at trial, so the jury had the opportunity to assess the credibility of their different versions of the shooting.  In this situation, "the '[d]efendant retains the opportunity to question the declarant as to the circumstances surrounding the prior statement[ ] and to elicit from the declarant an explanation for the inconsistencies in his prior statement and his on-the-stand testimony. Through such questioning, the defendant can test the credibility of the witness' statements on the witness stand  before the trier of fact.' " (*People v. Cuevas,* 12 Cal.4th 252, 273.)  Quoting Judge Learned Hand, *Cuevas* observes that "juries are capable of determining the credibility of out-of-court statements that are inconsistent with a witness's trial testimony by observing the witness's in-court demeanor:  'If, from all that

11

the jury see of the witness, they conclude that what he says now is not the truth, but what he said before, they are none the less deciding from what they see and hear of that person and in court. There is no mythical necessity that the case must be decided only in accordance with the truth of the words uttered under oath in court.' " (*Id*. at p. 273.) " 'The witness who has told one story aforetime and another today has opened the gates to all the vistas of truth which the common law practice of cross-examination and re-examination was invented to explore. The reasons for the change of face, whether forgetfulness, carelessness, pity, terror, or greed, may be explored by the two questioners in the presence of the trier of fact, under oath, casting light on which is the true story and which the false. *It is hard to escape the view that evidence of a prior inconsistent statement, when declarant is on the stand to explain it if he can, has in high degree the safeguards of examined testimony*.' " (*Ibid*, italics added.)

We are satisfied that the admission of the eyewitness identifications in these circumstances did not deprive defendant of a fair trial.

## III. Counsel Was Not Ineffective For Failing To Call An Eyewitness Expert

Defendant argues his trial counsel's failure to consult with and provide an expert witness to educate the jury on the pitfalls of eyewitness identifications constituted ineffective assistance of counsel. Again, we disagree.

In examining claims of ineffective assistance of counsel, we give great deference to counsel's reasonable tactical decisions. (*People v. Hinton* (2006) 37 Cal.4th 839, 876.) To establish ineffective assistance of trial counsel on appeal, a defendant has the burden of proving both that his counsel's performance was deficient under an objective standard of professional responsibility and that there is a reasonable probability that, but for counsel's errors, he would have obtained a more favorable result at trial. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) If the record fails to shed light on why counsel acted or failed to act, we reject a claim of ineffective assistance unless counsel was asked for an explanation and failed to provide one, or no satisfactory explanation exists. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.)

12

In *People v. Datt* (2010) 185 Cal.App.4th 942*,* as here, the defendant claimed his trial counsel provided ineffective assistance by failing to present an eyewitness identification expert. The court held defendant's contention "fail[ed] at its origin. He has not shown that his trial counsel *could have* presented any *favorable* expert testimony." (*Id*. at p. 952.) The court further explained that even though the defendant had produced testimony at a motion for a new trial "that a reasonably competent attorney would have *consulted* an expert on eyewitness identification," he produced no evidence that his trial counsel had not done so. (*Id*. at p. 953.)

So, too, here. The record does not disclose what actions, if any, trial counsel undertook to consult an expert witness. Nor has defendant shown that an expert on eyewitness identifications would have provided favorable testimony. Indeed, counsel could reasonably have felt that putting an identification expert on the stand might do more harm than good given the presence of certain factors generally acknowledged to increase the reliability of eyewitness identifications, e.g., the certainty with which Luckett initially identified defendant, that she did so immediately on the heels of the shooting, and that all three percipient witnesses were closely acquainted with defendant. (See, e.g., CALCRIM No. 315 [considerations relevant to evaluating identification testimony].) In short, defendant has not shown his trial counsel's performance was deficient.

## DISPOSITION

The judgment is affirmed.

                                                 _____

                                                 Siggins, J.

We concur:


_____

McGuiness, P.J.


_____

Jenkins, J.

14